IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CV-463-D

| | |
|---|---|
| ROSCOE DAVIS, JR., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAPITAL READY MIX CONCRETE, LLC, )<br>and ARTHUR KENNEDY, )<br>)<br>Defendants. ) | **ORDER** |

On September 2, 2021, Roscoe Davis, Jr. ("Davis" or "plaintiff") filed a complaint under the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 Stat. 178 (2020) ("FFCRA"), against Capital Ready Mix Concrete, LLC ("Capital") and Arthur Kennedy ("Kennedy") (collectively "defendants") in the Wake County Superior Court [D.E. 1-1] 2–12. Davis also asserted state law claims under the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1 et seq. (2023) ("NCWHA"), under the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. §§ 95-240 et seq. (2023) ("REDA"), and for wrongful interference with an entitlement benefit [D.E. 1-1] 4. On October 1, 2021, Davis amended his complaint [D.E. 1-1] 13–22. On November 8, 2021, the defendants removed the action to this court [D.E. 1]. On January 25, 2022, Davis filed a second amended complaint [D.E. 23].

On May 31, 2023, defendants moved for summary judgment [D.E. 44] and filed a memorandum in support [D.E. 45], a statement of material facts [D.E. 46], and an appendix [D.E. 47]. On June 21, 2023, Davis responded in opposition [D.E. 48] and filed a memorandum in support [D.E. 48-1], an opposing statement of material facts [D.E. 48-2], and exhibits [D.E. 48-3 to 48-15].

On July 5, 2023, defendants replied [D.E. 49] and responded to Davis's statement of material facts [D.E. 50]. As explained below, the court grants defendants' motion for summary judgment.

I.

On March 29, 2016, Davis began driving for Capital. See Defs.' Statement of Material Facts ("Defs.' SOMF") [D.E. 46] ¶ 1; Pl.'s Statement of Material Facts ("Davis SOMF") [D.E. 48-2] ¶ 1. During the relevant time period, Kennedy served as Capital's Vice President of Human Resources and Safety. See Defs.' SOMF ¶ 2; Davis SOMF ¶ 2. In late May 2020, Brandon O'Briant ("O'Briant"), another Capital employee, tested positive for COVID-19. See Defs.' SOMF ¶¶ 25–26; Davis SOMF ¶¶ 25–26. On May 28, 2020, after learning O'Briant tested positive, Capital notified its employees of their potential exposure and told them to report to Select Family Practice ("Select") for COVID-19 testing. See Defs.' SOMF ¶¶ 30, 32; Davis SOMF ¶¶ 30, 32. Capital contacted Davis, who was not working on May 28, and instructed him to report to work on May 29 and then get tested. See Defs.' SOMF ¶ 36; Davis SOMF ¶ 36. Davis then contacted another Capital employee, saying, "I'm going to take the test in the morning[,] and I'm letting them know that I will be staying home until results are back." Defs.' SOMF ¶ 37; see Davis SOMF ¶ 37. Davis also told two other Capital employees he was not comfortable returning to work before receiving his results. See Defs.' SOMF ¶ 38; Davis SOMF ¶ 38.

On May 29, 2020, Davis reported to Capital, where Anthony Letterman ("Letterman") told Davis to get a COVID-19 test and return to work. Compare Defs.' SOMF ¶¶ 44–45, with Davis SOMF ¶¶ 44–45. Davis told Letterman he intended to "go home and wait until [he got his] results back" and that he would talk to Letterman after receiving his results. See Defs.' SOMF ¶¶ 48, 50; Davis SOMF ¶¶ 48, 50. Letterman repeated his instruction to return to work. See Defs.' SOMF ¶ 49; Davis SOMF ¶ 49. Davis left for Select after another Capital employee instructed him to do so.

2

See Defs.' SOMF ¶¶ 53–54; Davis SOMF ¶¶ 53–54. At Select, medical assistant Gwendolyn Johnson ("Johnson") administered Davis's COVID-19 test. See Defs.' SOMF ¶ 55; Davis SOMF ¶ 55. Davis asked Johnson what he should do after the test, and she replied that "[a]fter you take this test, you go home." [D.E. 48-11] 122–23. Nobody else at Select instructed Davis to go home. See id. at 134–35.

After his test, Davis called Kennedy and told him he was going home until he received his results. See Defs.' SOMF ¶¶ 69–72; Davis SOMF ¶¶ 69–72. Davis went home. See Defs.' SOMF ¶ 73; Davis SOMF ¶ 73. Jason Holland ("Holland"), another Capital employee, called Davis to ask him to return to work, but Davis repeated that he would stay home until he received his results. See Defs.' SOMF ¶¶ 75–78; Davis SOMF ¶¶ 75–78. Holland reported this conversation and Davis's conduct during interactions with other Capital employees to Kennedy. Compare Defs.' SOMF ¶¶ 41, 51, 53, 79, with Davis SOMF ¶¶ 41, 51, 53, 79.[1] Capital's then-owner determined that Davis's refusal to come to work and his conduct towards other employees merited termination. See Defs.' SOMF ¶ 80; Davis SOMF ¶ 80. Kennedy participated in this decision but was not the ultimate decisionmaker. See Defs.' SOMF ¶ 81; Davis SOMF ¶ 81.[2] Kennedy then called Davis and gave him one more chance to return to work, but Davis again refused. See Defs.' SOMF ¶¶ 83–85; Davis SOMF ¶¶ 83–85. Kennedy then informed Davis that Capital had terminated Davis's employment. See Defs.' SOMF ¶ 86; Davis SOMF ¶ 86.

---

[1] The parties dispute whether these interactions were rude and unprofessional. Compare Defs.' SOMF ¶¶ 41, 51, 53, 79, with Davis SOMF ¶¶ 41, 51, 53, 79. The dispute is not material.

[2] Davis contends that Kennedy was the ultimate decisionmaker but fails to cite evidence rebutting Kennedy's deposition testimony. See Davis SOMF ¶ 81; [D.E. 48-12] 27. Accordingly, the court accepts defendants' statement. See Local Civ. R. 56.1(a)(4); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir 2017) (per curiam) (unpublished).

3

On May 31, 2020, Davis filed for unemployment benefits. See Defs.' SOMF ¶ 87; Davis SOMF ¶ 87. Davis reported to the North Carolina Division of Employment Security ("NCDES") that Capital terminated his employment "[f]or refusing to report back to work after [C]ovid-19 testing . . . . [because he] wanted to get [his] results back first then report back to work." Defs.' SOMF ¶ 90; see Davis SOMF ¶ 90. Capital reported to the NCDES that it terminated Davis for "refus[ing] duty and [being] disrespectful to various employees." Defs.' SOMF ¶ 93; see Davis SOMF ¶ 93. NCDES initially concluded Davis was discharged for misconduct and denied his claim, but on appeal Davis received unemployment benefits. See Defs.' SOMF ¶¶ 96, 101; Davis SOMF ¶¶ 96, 101; [D.E. 48-11] 192.

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view

4

the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

A.

In Davis's first claim, Davis alleges that defendants violated the FFCRA. See Sec. Am. Compl. [D.E. 23] ¶¶ 27–42. The FFCRA includes the Emergency Paid Sick Leave Act ("EPSLA"), FFCRA §§ 5101–11, 134 Stat. at 195–201.[3] The EPSLA required employers to provide 80 hours of paid sick leave to full-time employees who met one of the statute's six specified criteria. See FFCRA § 5102(a)(1)–(6), (b)(2)(A). The parties agree that the only criterion potentially applicable to Davis was that he had "been advised by a health care provider to self-quarantine due to concerns related to COVID-19." FFCRA § 5102(a)(2); see Defs.' Mem. Supp. Mot. Summ. J. [D.E. 45] ("Defs.' Mem.") 12–16; Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. [D.E. 48] ("Davis Mem.") 11–13.

The term "health care provider" in the EPSLA has the same meaning as in section 101 of the Family and Medical Leave Act of 1993 ("FMLA") (codified at 29 U.S.C. § 2611). See FFCRA § 5110(4). In the EPSLA, Congress delegated rulemaking authority to the Secretary of Labor. See

---

[3] On December 31, 2020, the EPSLA expired. See FFCRA § 5109.

5

FFCRA § 5111. On April 6, 2020, the Secretary promulgated rules under the FFCRA which reference the FMLA's regulations to further define "health care provider." See 29 C.F.R. § 826.20(a)(3), 85 Fed. Reg. 19326, 19349 (Apr. 6, 2020); see also 29 C.F.R. § 825.102. Those regulations define "health care provider" as "[a] doctor of medicine or osteopathy who is authorized to practice medicine or surgery . . . by the State in which the doctor practices"; or "[a]ny other person determined by the Secretary to be capable of providing health care services." 29 C.F.R. § 825.102. The regulation limits the latter category to "[n]urse practitioners, nurse-midwives, clinical social workers[,] and physician assistants who are authorized to practice under State law" or "[a]ny health care provider from whom an employer or the employer's group health plan's benefits manager will accept certification of the existence of a serious health condition to substantiate a claim for benefits." Id.

Davis relies on Johnson's instruction for his EPSLA claim. See Davis Mem. 11; [D.E. 48-3] 3. Johnson administered Davis's COVID-19 test. See [D.E. 48-3] 3; Defs.' SOMF ¶ 55; Davis SOMF ¶ 55. When Johnson gave Davis instruction, Johnson was a medical assistant. See [D.E. 48-3] 3; Defs.' SOMF ¶ 55; Davis SOMF ¶ 55. As a medical assistant, Johnson was not authorized to practice medicine or osteopathy in North Carolina, and she was not acting as a nurse practitioner, nurse midwife, clinical social worker, or physician assistant. See [D.E. 47-23] 6–7; Defs.' SOMF ¶¶ 56, 58; Davis SOMF ¶¶ 56, 58. Thus, Johnson does not qualify as a "health care provider" unless Davis can show Capital would have accepted "certification of the existence of a serious health condition to substantiate a claim for benefits" from Johnson. 29 C.F.R. § 825.102.

Davis argues Johnson "could or would be someone" who meets this definition and cites the deposition testimony of Reza Hatefi ("Hatefi"), one of Select's co-owners. Davis Mem. 12; see Davis SOMF ¶ 106. Hatefi testified, however, that Johnson was generally not authorized to prepare

6

documentation. See [D.E. 48-13] 6, 62–64. Johnson could only print and send documentation once a health care provider completed the documentation. See [D.E. 48-13] 63. For example, although Johnson administered Davis's COVID-19 test, physician assistant Susan Horlick ("Horlick") ordered the test, documented the test, and signed the documentation. See [D.E. 47-5] 2–4; [D.E. 48-13] 51. Select did not authorize Johnson to instruct anyone to quarantine, and Hatefi corrected Johnson for giving Davis instructions. See [D.E. 48-13] 58–59, 89, 94. Moreover, Davis has not cited any evidence that, even had Select so authorized Johnson, Capital would have accepted a certification from her. Thus, Johnson is not a "health care provider" under the EPSLA, and Davis cannot claim protection under the EPSLA. Accordingly, the court grants defendants summary judgment on Davis's first claim. See Colombe v. SGN, Inc., No. 5:20-CV-374-REW, 2021 WL 1198304, at *4–5 & n.9 (E.D. Ky. Mar. 29, 2021) (unpublished).

Alternatively, Davis's claim fails because he did not properly request sick leave. See 29 C.F.R. § 826.100. Specifically, an employee seeking EPSLA leave must "provide the [e]mployer documentation containing the . . . (1) [e]mployee's name; (2) [d]ate(s) for which leave is requested; (3) [q]ualifying reason for the leave; and (4) [an o]ral or written statement that the [e]mployee is unable to work because of the qualified reason for leave." Id. § 826.100(a). Additionally, if an employee seeks EPSLA leave because he was "advised by a health care provider to self-quarantine," he also must provide his employer with the name of that health care provider. See id. § 826.100(c); see also FFCRA § 5102(a)(2).[4] If an employer requires its employees to follow reasonable notice

---

[4] On August 3, 2020, another district court rejected "the requirement that the documentation be provided before taking leave," but upheld "the substance of the documentation requirement." New York v. U.S. Dep't of Lab., 477 F. Supp. 3d 1, 18 (S.D.N.Y. 2020). Accordingly, the Department of Labor updated the regulation to require only that the documentation "be given as soon as practicable." 85 Fed. Reg. 57677, 57686 (Sept. 16, 2020). Capital fired Davis in May 2020, and this court need not decide whether the April 2020 or September 2020 rule applies.

7

procedures and "an [e]mployee fails to give proper notice, the [e]mployer should give him or her notice of the failure and an opportunity to provide the required documentation." 29 C.F.R. § 826.90(a)(1). This language is not mandatory, however, and an employer's failure to provide this opportunity to an employee does not excuse the employee's failure to provide proper documentation. See, e.g., Wilson v. Marshall Shredding LLC, 616 F. Supp. 3d 633, 644–45 (W.D. Tex. 2022); Colombe, 2021 WL 1198304, at *5–6.

Davis's claim also fails because he did not provide the required documentation to defendants. "Documentation" means "[o]fficial documents, reports, and the like used to prove that something is true or correct . . . [t]he act of recording information in a tangible medium." Documentation, BLACK'S LAW DICTIONARY (11th ed. 2019). "Document" means "[s]omething tangible on which words, symbols, or marks are recorded." Document, BLACK'S LAW DICTIONARY (11th ed. 2019). Davis did not provide any documents to defendants, except a form stating that he received a COVID-19 test. See [D.E. 47-6] 2. That document does not contain the information that the regulation required. See 29 C.F.R. § 826.100(a).

In opposition, Davis argues defendants did not allow him an opportunity to secure any other documentation before terminating his employment. See Davis Mem. 4. Davis, however, did not seek any such documentation until August 15, 2020, over two and a half months after his termination. See [D.E. 48-3] 1–3. Even then, that document does not meet the requirements, including the dates requested for leave and a statement that Davis was unable to work. See 29 C.F.R. § 826.100(a). Moreover, Davis fails to cite evidence that he ever offered this documentation to defendants. Accordingly, Davis failed to provide the required documentation under the EPSLA.

Alternatively, even if the term "documentation" includes oral statements (an oxymoron), Davis's statements still fail to meet the statutory criteria. After Davis's COVID-19 test, Davis had

8

three conversations with Capital employees (including two with Kennedy). See Defs.' SOMF ¶¶ 69–72, 75–78, 83–86; Davis SOMF ¶¶ 69–72, 75–78, 83–86. In two of those conversations, Davis told Kennedy and Holland he had "been advised to go home" and "was instructed to quarantine" after the test. [D.E. 48-11] 37–38, 154. Davis also told Kennedy "the test results should be back Monday or Tuesday" and that he then would return to work. Id. at 141, 157. Viewing the evidence in the light most favorable to Davis, these oral statements provide Capital with notice of Davis's name, his intent to take leave, the fact that he was instructed to do so, and when his leave would end. Davis has not, however, produced evidence he provided Johnson's name to Kennedy or Capital, only that he had "been advised" or "was instructed" to go home. [D.E. 48-11] 37–38, 154. Moreover, neither Kennedy nor Holland testified that Davis provided Johnson's name to them. See [D.E. 48-12, 48-14]. Accordingly, the court grants summary judgment to defendants on Davis's first claim.

B.

Davis's second and third claims allege FFCRA retaliation claims against Kennedy and Capital. The EPSLA references the Fair Labor Standard Act for its enforcement provisions. See FFCRA § 5105. Where a plaintiff lacks direct evidence of retaliation (as in this case), courts use the McDonnell Douglas framework to evaluate FFCRA and EPSLA retaliation claims. See, e.g., Wadley v. Nat'l Ry. Equip. Co., 572 F. Supp. 3d 361, 370 (W.D. Ky. 2021); Kovacevic v. Am. Int'l Foods Inc., No. 1:21-CV-72, 2021 WL 3629756, at *4 (W.D. Mich. Aug. 17, 2021) (unpublished); Kofler v. Sayde Steeves Cleaning Serv., Inc., No. 8:20-CV-1460-T-33AEP, 2020 WL 5016902, at *2 (M.D. Fla. Aug. 25, 2020) (unpublished).

Under the McDonnell Douglas framework: "(1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3)

9

the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." Guessous v. Fairview Prop. Investments, LLC, 828 F.3d 208, 216 (4th Cir. 2016) (citation omitted). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were merely a pretext for discrimination. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003).

To establish a prima facie case, a plaintiff must show (1) he "engaged in a protected activity," (2) his employer "took adverse action" against him, and (3) "a causal relationship existed between the protected activity and the adverse employment activity." Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 653 (4th Cir. 2021); see Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 346–360 (2013); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015); Miles-Stephens v. N.C. Dep't of Corr., No. 5:11-CV-597, 2014 WL 3110018, at *5 (E.D.N.C. July 7, 2014) (unpublished).

The EPSLA prohibits employers from discharging, disciplining, or discriminating against any employee who "(1) takes leave in accordance with this Act; and (2) has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act (including a proceeding that seeks enforcement of this Act), or has testified or is about to testify in any such proceeding." FFCRA § 5104.

10

Davis's retaliation claims fail because he did not engage in a protected activity. As for the first element, Davis argues that the phrase "takes leave" must mean something broader than "takes paid sick leave." Davis Mem. 13. According to Davis, "[a]n employee who attempts to secure paid leave, but fails to meet the requirements of the Act should be given the same protections . . . . Thus, [Davis] does not need to meet the criteria of FFCRA § 5102 . . . to be protected from retaliation." Id. Davis's reading, however, erases the phrase "in accordance with this Act" from the statute. See Wilson, 616 F. Supp. 3d at 644; Colombe, 2021 WL 1198304, at *3, *5. Davis must produce evidence that he properly took EPSLA leave. He has not. Thus, Davis's ESPLA retaliation claims fail.

Alternatively, in the EPSLA, Congress used the conjunctive "and" when describing the protected activity. See FFCRA § 5104. Thus, Davis must have completed both prongs to be protected from retaliation. See Piotrowski v. Signature Collision Ctrs., LLC, No. 2:21-CV-2115, 2021 WL 4709721, at *3–4 (E.D. Pa. Oct. 8, 2021) (unpublished) ("On its face, the EPSLA requires a plaintiff to take both steps . . . in order to assert a retaliation claim."); see also United States v. Jones, 60 F.4th 230, 233 (4th Cir. 2023).[5] Davis filed a complaint with the North Carolina Department of Labor ("NCDOL"). See [D.E. 48-6]. Davis, however, filed his NCDOL complaint over two months after his termination. See id. No evidence suggests he threatened to file this complaint or otherwise made defendants aware of it before filing. Thus, Davis's claims also fail the causation element of his prima facie cases. See, e.g., Strothers v. City of Laurel, 895 F.3d 317, 336 (4th Cir. 2018) (noting that to show causation, the plaintiff must demonstrate the employer took

---

[5] Some district courts have read section 5104 to be disjunctive. See, e.g., Hartzell v. Adaptable Sys. Corp., No. CIV 21-1873, 2022 WL 1500554, at *13–14 (E.D. Pa. May 11, 2022) (unpublished) (collecting cases). The court rejects this reading in light of the statutory text and the Fourth Circuit's instructive analysis of "and" in Jones, 60 F.4th 230.

adverse action "soon after" becoming aware of plaintiff's protected activity (emphasis added)); Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). Accordingly, the court grants summary judgment to defendants on Davis's FFCRA retaliation claims.[6]

C.

In claims four and five, Davis asserts NCWHA and REDA claims. See Sec. Am. Compl. ¶¶ 68–87. In relevant part, the NCWHA provides that "[a]ny employer who violates the provisions of G.S. 95-25.3 (Minimum Wage), G.S. 95-25.4 (Overtime), or G.S. 95-25.6 through 95-25.12 (Wage Payment) shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, their unpaid overtime compensation, or their unpaid amounts due under G.S. 95-25.6 through 95-25.12, as the case may be." N.C. Gen. Stat. § 95-25.22(a). The NCWHA also provides liquidated damages if the court finds the employer acted in bad faith. See id. § 95-25.22(a1). In relevant part, REDA provides that "[n]o person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to . . . [f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to" the Occupational Safety and Health Act of North Carolina ("OSHANC"). N.C. Gen. Stat. § 95-241(a)(1).

The Supremacy Clause renders federal law "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947); M'Culloch v. Maryland, 17 U.S. 316, 405–06 (1819). "As a result, federal statutes and regulations properly enacted and promulgated can nullify conflicting state or local actions." Coll. Loan Corp. v. SLM Corp., 396 F.3d 588, 595 (4th

---

[6] Because the court grants summary judgment on Davis's federal statutory claims, the court does not address whether Kennedy is Davis's "employer" under the relevant statutes.

12

Cir. 2005) (quotation omitted). Preemption may be express or implied. See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152–53 (1982); Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977); Cox v. Shalala, 112 F.3d 151, 154 (4th Cir. 1997). Federal law preempts state law in three circumstances: (1) "express preemption," where "Congress has expressly declared its intent to preempt state law"; (2) "field preemption," where Congress has "occupied the field by regulating so pervasively that there is no room left for the states to supplement federal law"; and (3) "conflict preemption," where "there is actual conflict between the state and federal laws." Figueroa v. Butterball, LLC, No. 5:20-CV-585, 2021 WL 4203652, at *7 (E.D.N.C. Sept. 15, 2021) (unpublished) (quotation omitted); see Rice, 331 U.S. at 230; M'Culloch, 17 U.S. at 405–06; Anderson v. Sara Lee Corp., 508 F.3d 181, 191 (4th Cir. 2007); Pinney v. Nokia, Inc., 402 F.3d 430, 453 (4th Cir. 2005); Cox, 112 F.3d at 154; Martinez-Hernandez v. Butterball, LLC, 578 F. Supp. 2d 816, 818 (E.D.N.C. 2008); Zelaya v. J.M. Macias, Inc., 999 F. Supp. 778, 781 (E.D.N.C. 1998).

The EPSLA's enforcement provisions provide that a violation of its substantive provisions shall be considered a violation of the Fair Labor Standards Act of 1938 ("FLSA"). See FFCRA § 5105(a)(1), (b)(1). Employers who violate the EPSLA are subject to the remedies in the FLSA. See id. § 5105(a)(2), (b)(2). No court has considered whether the EPSLA preempts the NCWHA. As noted, however, some courts have treated the EPSLA like the FLSA because of the enforcement provisions. See Wadley, 572 F. Supp. 3d at 370; Kovacevic, 2021 WL 3629756, at *4; Kofler, 2020 WL 5016902, at *2. And "[w]hether the FLSA preempts an NCWHA ... claim is a question of conflict preemption—namely, whether the NCWHA ... stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the FLSA." Figueroa, 2021 WL 4203652, at *7 (quotation omitted).

13

The FLSA contains a savings clause that allows states to provide workers with greater protections than those under the FLSA. See 29 U.S.C. § 218(a); Sara Lee Corp., 508 F.3d at 193. The FLSA does not, however, "explicitly authorize states to create alternative remedies for FLSA violations." Anderson, 508 F.3d at 193. Moreover, "the FLSA's unusually elaborate enforcement scheme" diminishes the otherwise "exceptionally strong presumption against preemption of state remedies." Id.; see Abbott ex rel. Abbott v. Am. Cyanamid Co., 844 F.2d 1108, 1112 (4th Cir. 1988). Accordingly, Congress provided exclusive remedies in the FLSA for violating its provisions. See Anderson, 508 F.3d at 194; Kendall v. City of Chesapeake, 174 F.3d 437, 443 (4th Cir. 1999). Thus, the FLSA preempts claims in which the plaintiff relies on the FLSA for his rights and invokes state law only as the source of remedies for the alleged FLSA violations. See Anderson, 508 F.3d at 193. In other words, the FLSA preempts "state claims [that] depend on establishing [the defendant] violated the FLSA, either in good faith or willfully." Id.

Davis's NCWHA claim is preempted because it depends on whether defendants violated the EPSLA. Davis alleges he was entitled to paid sick leave under the EPSLA. See Sec. Am. Compl. ¶¶ 68–72. He also alleges that defendants' failure to provide him with such paid sick leave violated the EPSLA and the NCWHA, and seeks remedies under the NCWHA. See id. at ¶¶ 68–79. Davis does not contend that the NCWHA (or any other North Carolina law) entitles him to the paid sick leave he seeks. Instead, Davis's NCWHA claim turns solely on defendants' alleged EPSLA violation. See id. Davis's argument in opposition to defendants' motion for summary judgment implicitly concedes as much. See Davis Mem. 16–19. Accordingly, the court grants defendants summary judgment on Davis's NCWHA claim.

As for Davis's REDA claim, Davis alleges Capital unlawfully discriminated against him after he "excercise[d] his rights afforded by" OSHANC. See Sec. Am. Compl. ¶ 82. He contends this

14

discrimination violated REDA. See id. at ¶ 83. In support, Davis cites evidence implicating REDA and OSHANC independent of his evidence of defendants' alleged FFCRA violations. See, e.g., [D.E. 48-11] 164–66, 213–14 (notifying defendants of work conditions Davis felt were unsafe). Thus, unlike Davis's NCWHA claim, Davis's REDA claim does not solely "depend on establishing [the defendant] violated the FLSA." Anderson, 508 F.3d at 193. Accordingly, the claim is not preempted, and the court analyzes Davis's REDA claim.

In analyzing Davis's REDA claim, the court applies North Carolina substantive law. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 629–30 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

15

For a REDA claim, a plaintiff must show (1) he exercised a right listed under N.C. Gen. Stat. § 95-241(a); (2) he suffered an adverse employment action; and (3) a causal connection between the alleged retaliatory action and the exercise of his statutory right. See Tuan H. Nguyen v. Austin Quality Foods, Inc., 974 F. Supp. 2d 879, 882–83 (E.D.N.C. 2013); Pierce v. Atl. Grp., 219 N.C. App. 19, 25, 714 S.E.2d 568, 573 (2012); Wiley v. UPS, Inc., 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004). Adverse action under REDA includes "the discharge, suspension, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment." N.C. Gen. Stat. § 95-240(2).

As for the first element, REDA protects plaintiffs who "[f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to" OSHANC and other state statutes. N.C. Gen. Stat. § 95-241(a)(1). "The Supreme Court of North Carolina has not ruled on whether an internal complaint is a protected activity under REDA." Driskell v. Summit Contracting Grp., Inc., 828 F. App'x 858, 866 (4th Cir. 2020) (unpublished) (quotation omitted).

Some internal complaints are protected under REDA. See id. at 866–67; Pierce, 219 N.C. App. at 26–28, 724 S.E.2d at 573–75. In Pierce, the court found several federal district court opinions persuasive. See Pierce, 219 N.C. App. at 26–28, 724 S.E.2d at 573–75. The Pierce court observed that REDA did not protect plaintiffs who "merely talk[ed] to an internal supervisor about potential safety concerns," "orally complained to their employers about unsafe working conditions," or "did not initiate a complaint with the Occupational Safety and Health Review Commission or threaten to initiate any such complaint." See id., 724 S.E.2d at 573–76; Jurrissen v. Keystone Foods, LLC, No. 1:08CV128, 2008 WL 3925086, at *5 (M.D.N.C. 2008) (unpublished); Cromer v. Perdue Farms, Inc., 900 F. Supp. 795, 801 n.6 (M.D.N.C. 1994). By contrast, the Pierce court observed that

16

federal district courts had held that REDA protected a plaintiff who "specifically communicated with the defendant's internal auditor about an 'ongoing investigation into [the] defendant's health and safety practices.'" Pierce, 219 N.C. App. at 28, 724 S.E.2d at 575 (quoting Jurrissen, 2008 WL 3925086, at *6).

The Pierce court affirmed dismissal of a REDA claim where the plaintiff "spoke only to his supervisors about his concerns" and to an internal company ethics hotline. Id., 724 S.E.2d at 575. In Driskell, the Fourth Circuit relied on Pierce and held that REDA protected a plaintiff whose complaints to his employer's president and CEO led to an investigation into OSHANC violations. See Driskell, 828 F. App'x at 867.

Davis's REDA claim fails for the same reasons as the plaintiff's claim in Pierce. Specifically, Davis has not cited evidence that supports his claim that he engaged in a protected activity under REDA. Rather, the record reflects that Davis believed he and other drivers possibly were exposed to COVID-19 at work. See [D.E. 48-11] 213–14. Davis communicated his concerns about COVID-19 to Holland and Kennedy. See id. at 164–66. As in Pierce, Davis conveyed his concerns to his superiors. See Pierce, 219 N.C. App. at 28, 724 S.E.2d at 575; Jurrissen, 2008 WL 3925086, at *5; Cromer, 900 F. Supp. at 801 n.6. Davis fails to demonstrate, however, that he did anything before his termination to invoke REDA's protection, such as communicate his concerns to an auditor or threaten to initiate a complaint with the Occupational Safety and Health Review Commission.[7] Likewise, Davis did not raise his concerns with Capital's president or CEO, and his complaints did not lead or relate to an investigation. Accordingly, the court grants defendants' summary judgment to defendants on Davis's REDA claim.

---

[7] After Davis's termination, Davis filed a retaliatory employment discrimination complaint form with the North Carolina Department of Labor. See [D.E. 48-6].

17

Alternatively, Davis's REDA claim fails because Davis cannot show causation. The record reflects that defendants fired Davis not because he raised concerns about COVID-19 but because he refused to return to work. See, e.g., [D.E. 48-11] 24–25, 157; [D.E. 48-12] 8. If Davis instead predicated his REDA claim on his taking leave under the EPSLA, it would be preempted for the same reasons as his NCWHA claim.

D.

In claim six, Davis contends Capital wrongfully interfered with his receipt of unemployment benefits. See, e.g., Sec. Am. Compl. ¶¶ 88–93; Davis Mem. at 19–20. North Carolina courts have not recognized this cause of action. Nonetheless, Davis asks this court to fashion a new cause of action out of whole cloth. See Davis Mem. 19–20. In support, Davis cites Marbury v. Madison, 5 U.S. (1 Cranch) 37 (1803), for the proposition that every right withheld must have a remedy and every injury its proper redress. See id.

This court predicts that the Supreme Court of North Carolina would not create such a cause of action in light of the comprehensive unemployment statute that the General Assembly created. See Time Warner Ent.-Advance/Newhouse P'ship, 506 F.3d at 313–15. Thus, the court declines to create the requested cause of action and grants defendants summary judgment on this claim. See id.; Day & Zimmermann, Inc., 423 U.S. at 4; Wade, 182 F.3d at 286

III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 44]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 7 day of November, 2023.

                                                  /s/ J. Dever
                                                  JAMES C. DEVER III
                                                  United States District Judge